IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| DANIEL BURNS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 07-19 |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I. Introduction

Plaintiff, Daniel Burns, seeks judicial review of a decision
of Defendant, Commissioner of Social Security ("Commissioner"),
denying his applications for disability insurance benefits
("DIB") and supplemental security income ("SSI") under Titles II
and XVI, respectively, of the Social Security Act, 42 U.S.C.
§§ 401-433 and §§ 1381-1383f. Presently before the Court are the
parties' cross-motions for summary judgment pursuant to
Fed.R.Civ.P. 56. For the reasons set forth below, Plaintiff's
motion for summary judgment will be granted with respect to his
alternative request for a remand of this case for further
administrative proceedings, and the Commissioner's cross-motion
for summary judgment will be denied.

1

## II. Background

### A. Procedural History

Plaintiff filed applications for DIB and SSI on May 28,
2004, alleging disability since December 26, 2003 due to
arthritis, Major Depressive Disorder and headaches. (R. 47-49,
53, 251-53). Following the denial of his applications, Plaintiff
requested a hearing before an Administrative Law Judge ("ALJ").
(R. 36). At the hearing, which was held on May 19, 2006,
Plaintiff, who was represented by counsel, and a vocational
expert ("VE") testified. (R. 268-90). On May 26, 2006, the ALJ
issued a decision denying Plaintiff's applications for DIB and
SSI, concluding that Plaintiff retained the residual functional
capacity ("RFC") to perform past relevant work.[1] (R. 12-20).
Plaintiff's request for review of the ALJ's decision was denied
by the Appeals Council on November 8, 2006. (R. 5-7). This
appeal followed.

### B. Plaintiff's Personal History

Plaintiff's date of birth is October 19, 1956. (R. 47)
Plaintiff dropped out of high school in the 11th grade; however,
he subsequently obtained a General Equivalency Diploma and a
degree in drafting from the Pittsburgh Technical Institute. (R.
59, 271). In the past, Plaintiff has worked as a line cook (off

---

[1]The Social Security Regulations define RFC as the *most* a
claimant can still do despite his or her limitations. *See* 20
C.F.R. §§ 404.1545 and 416.945.

2

and on between July 1989 and December 2003),[2] a janitor for a cleaning company (August 1992 to January 1993)[3] and a stock clerk in a grocery store (July 1995 to July 1996).[4]  (R. 68).

At the time of the administrative hearing, Plaintiff was residing with his mother and her husband, and his daily activities included drinking coffee, watching television, playing the guitar and reading newspapers.  (R. 273-74).  Plaintiff took Lipitor for high cholesterol and Lisinopril for high blood pressure,[5] which were prescribed by his primary care physician, Dr. Hany Rezk.  Plaintiff also took Remeron and Effexor XR for depression and anxiety, which were prescribed by Dr. Anna Kosturek, his treating psychiatrist at the Human Services Center.[6]

---

[2]Plaintiff testified at the administrative hearing that his last employment as a line cook came to an end when he walked off the job because the restaurant had "[e]ntirely too much business" and he became frustrated.  (R. 272).

[3]Plaintiff left his job as a janitor to attend school to obtain the drafting degree.  (R. 272).

[4]Despite his degree in drafting, Plaintiff has never worked as a draftsman.  (R. 271).

[5]Lipitor is used together with lifestyle changes (diet, weight loss and exercise) to reduce the amount of cholesterol (a fat-like substance) and other fatty substances in the blood. Lisinopril is used alone or in combination with other medications to treat high blood pressure.  www.nlm.nih.gov/medlineplus/druginfo (last visited 5/19/2008).

[6]Remeron is used to treat depression, and Effexor XR is used to treat depression, generalized anxiety disorder (excessive worrying that is difficult to control), social anxiety disorder (extreme fear of interacting with others or performing in front of others that interferes with normal life) and panic disorder

3

(R. 55, 277).

## C. Vocational Expert Testimony

At the administrative hearing, the ALJ initially asked the
VE to classify Plaintiff's past work. The VE testified that
Plaintiff's job as a line cook was light, semi-skilled work; his
job as a janitor was medium, unskilled work; and his job as a
stock clerk was medium to heavy, unskilled work.   (R. 288).

The ALJ then asked the VE to assume a hypothetical
individual of Plaintiff's age, education and work experience who
has no exertional limitations but is limited to performing
simple, repetitive tasks that do not involve (a) dealing with the
general public, (b) close interaction with co-workers, (c)
independent decision-making, (d) high levels of stress or (e) a
rapid production pace.   When asked whether the hypothetical
individual could perform any of the jobs that Plaintiff performed
in the past, the VE testified that the hypothetical individual
could perform Plaintiff's past work as a janitor and a stock
clerk.   (R. 289).

Plaintiff's counsel then asked the VE whether the
hypothetical individual could perform the jobs of a janitor or a
stock clerk if he had a poor ability or no ability to deal with
the public, deal with work stresses and maintain attention and

_____

(sudden, unexpected attacks of extreme fear and worry about these
attacks).   www.nlm.nih.gov/medlineplus/druginfo (last visited
5/19/2008).

4

concentration. With the additional limitations, the VE testified that the hypothetical individual would not be able to perform any jobs in the national economy.  (R. 289).

## D. Medical Evidence[7]

On January 28, 2004, Plaintiff presented to the Emergency Room of Jameson Memorial Hospital complaining of increased anxiety due to quitting his job as a cook because it involved "too much stress." Plaintiff denied depression, reporting that anxiety and stress were his major issues. Plaintiff appeared anxious and restless; however, his insight and judgment were intact and his thought content was appropriate. Because Plaintiff did not meet the criteria for inpatient admission, he was referred to outpatient treatment.  (R. 102-114).

On February 13, 2004, Plaintiff underwent an intake evaluation at the Human Services Center for the following complaints: a 15-year history of depression, unemployment, social isolation, anhedonia, difficulty coping with adult responsibilities, sleeping difficulties, panic attacks in stressful situations, a 3-year history of difficulties in social situations and a short temper. Based on the information provided

---

[7]In his decision, the ALJ concluded that the record lacks sufficient evidence to support Plaintiff's claim of disabling arthritis and headaches. Because Plaintiff does not challenge this determination in his summary judgment motion, the Court's summary of the evidence in the case file will be limited to the evidence pertaining to Plaintiff's mental impairment.

5

by Plaintiff, the evaluator indicated that Plaintiff was "markedly" limited with regard to job performance, financial situation, sexual functions, impulse/anger control and ability to concentrate, and "extremely" limited with regard to family relationships, friendships/peers and sleeping habits. Plaintiff's appearance, attitude, motor activity, thought process, thought content, orientation, memory, judgment, insight and intellect were described as "OK;" his affect was described as flat; and his mood was described as depressed/sad. Plaintiff's treatment plan included individual psychotherapy. (R. 132-38).

On February 19, 2004, Plaintiff underwent a psychiatric evaluation by Anna Kosturek, M.D., a staff psychiatrist at the Human Services Center. With respect to Plaintiff's mental status examination, Dr. Kosturek noted that Plaintiff was "somewhat disheveled" and "vague;" that it was difficult to obtain a longitudinal history from him; that there were some inconsistencies in his story between the intake evaluation and this evaluation; that his speech was "very soft and monotonous;" that his affect was constricted and depressed; that he exhibited psychomotor retardation; that his thought process was logical and his thought content was negative for suicidal or homicidal thoughts, intent or plan; that his insight and judgment were fair; and that, although no formal memory testing was done, his attention and concentration appeared to be impaired based on her

observation. Dr. Kosturek's diagnostic impression was Major
Depressive Disorder without Psychotic Features. Dr. Kosturek
rated Plaintiff's score on the Global Assessment of Functioning
("GAF") Scale a 55,[8] and she prescribed Lexapro for Plaintiff.[9]
(R. 130-31).

During a medication check with Dr. Kosturek on April 8,
2004, Plaintiff reported that he was not taking the Lexapro she
had prescribed because the medication did not help his symptoms;
that he was feeling anxious and frustrated about not starting
individual psychotherapy yet; and that he was under a lot of
stress due to unemployment and housing problems. Dr. Kosturek
changed Plaintiff's medication to Paxil.[10] (R. 126).

Two weeks later, on April 22, 2004, Plaintiff was seen by a

_____

[8]The GAF scale considers psychological, social and
occupational functioning on a hypothetical continuum of mental
health to illness and is used by clinicians to report an
individual's overall level of functioning. The highest possible
score is 100 and the lowest is 1. GAF scores between 51 and 60
denote "**[m]oderate symptoms** (e.g., flat affect and circumstantial
speech, occasional panic attacks) **OR moderate difficulty in
social, occupational, or school functioning** (e.g., few friends,
conflicts with peers or co-workers). American Psychiatric
Association, Diagnostic and Statistical Manual of Mental
Disorders, Fourth Edition ("DSM-IV"), at p. 34.

[9]Lexapro is used to treat depression and generalized anxiety
disorder (excessive worry and tension that disrupts daily life
and last for 6 months or longer). www.nlm.nih.gov/medlineplus/
druginfo (last visited 5/19/2008).

[10]Paxil is used to treat depression, panic disorder and
social anxiety disorder. www.nlm.nih.gov/medlineplus/druginfo
(last visited 5/19/2008).

7

psychiatric nurse at the Human Services Center for a medication check. The nurse described Plaintiff's hygiene and appearance as "somewhat unkempt." The nurse also noted that Plaintiff was anxious during the visit, reporting "a lot of car problems, financial problems, and feel[ing] stressed out," as well as difficulties sleeping at night. Plaintiff also reported that although the Paxil was slightly effective in taking the edge off his anxiety, the medication upset his stomach. After a consultation with Dr. Kosturek, Plaintiff's medication was changed to Remeron.[11] (R. 125). The next day, April 23, 2004, Plaintiff began individual psychotherapy at the Human Services Center with Larry Petro who noted that Plaintiff continued to report feelings of anxiety and depression.[12]

When Plaintiff saw Dr. Kosturek for a medication check on May 10, 2004, he reported "feeling somewhat better, less easily irritated, and calmer," although he still felt quite depressed and continued to have difficulty sleeping. Dr. Kosturek increased Plaintiff's dosage of Remeron and prescribed Trazodone

---

[11]Remeron is used to treat depression. www.nlm.nih.gov/ medlineplus/druginfo (last visited 5/19/2008).

[12]The case file contains notes of 70 individual psychotherapy sessions with Mr. Petro between April 23, 2004 and March 31, 2006. Mr. Petro's notes of these sessions repeatedly indicate that Plaintiff reported and exhibited symptoms of depression and high degrees of anxiety. (R. 201-20).

8

for his insomnia.[13]  (R. 124).

Plaintiff's next medication check with Dr. Kosturek took place on June 14, 2004.  The doctor described Plaintiff as "mildly anxious" with good eye contact, normal speech, a logical thought process and no suicidal or homicidal thoughts or psychosis.  Because Plaintiff continued to experience anxiety in social situations, to worry "all the time about various things in his life" and to have difficulty sleeping, Dr. Kosturek continued the Remeron for Plaintiff, increased his dosage of Trazadone and added Zoloft to his medication regimen.[14]  (R. 123).

During his medication check with Dr. Kosturek on July 12, 2004, Plaintiff reported that he was doing better overall.  His depressive symptoms were about 50% improved; he was sleeping better; and his energy level was "somewhat improved."  However, Plaintiff also reported that he continued to have fleeting suicidal thoughts but with no clear intention or plan.  Dr. Kosturek continued Plaintiff's prescribed medications, although she decreased the dosage of his Zoloft because he was feeling "overly sedated."  (R. 186).

---

[13]Trazadone is used to treat depression.  This medication also is used sometimes to treat schizophrenia, anxiety and alcohol abuse.  www.nlm.nih.gov/medlineplus/druginfo (last visited 5/19/2008).

[14]Zoloft is used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder and social anxiety disorder.  www.nlm.nih.gov/medlineplus/druginfo (last visited 5/19/2008).

9

Nine days later, on July 21, 2004, Plaintiff was taken by ambulance to the Emergency Room of Jameson Memorial Hospital for a possible drug overdose.[15] During his assessment, Plaintiff admitted to depression but denied suicidal ideas.[16] He was alert, oriented and goal directed and his thoughts were organized. In addition, Plaintiff was able to verbally contract for his safety. Plaintiff's stressors at the time included financial and family problems and denial of welfare benefits, and he appeared "quiet & withdrawn." A mental health delegate was assigned to Plaintiff, and he was discharged with instructions to follow-up with outpatient services. (R. 228-50).

Plaintiff's next medication check with Dr. Kosturek took place on August 9, 2004. The doctor noted that Plaintiff was "fairly well groomed" with "intermittent eye contact" and soft and monotonous speech. Plaintiff reported that he had been doing better until he ran out of his medications several days before the appointment, and that after he stopped taking his medications, he felt more depressed and had difficulty sleeping again. Dr. Kosturek noted that Plaintiff's medications would be

[15]The hospital's records indicate that Plaintiff's mother called an ambulance after Plaintiff told her that he had taken an extra dose of Trazadone when he learned that Dr. Kosturek had not signed his "Medicaid form." (R. 236).

[16]Despite his denial of suicidal thoughts, the hospital's records indicate that Plaintiff told the paramedic who transported him to the hospital that he wanted to kill himself. (R. 230).

10

resumed. The doctor also noted that Plaintiff was starting a program at the Office of Vocational Rehabilitation ("OVR"). (R. 187).

On August 18, 2004, Sharon Tarter, Ph.D., a State agency psychological consultant, completed a Psychiatric Review Technique form in connection with Plaintiff's applications for DIB and SSI based on Listing 12.04 of the Social Security Regulations which pertains to Affective Disorders. With respect to the severity of the functional limitations resulting from Plaintiff's Major Depressive Disorder, Dr. Tarter opined that Plaintiff was mildly limited in Activities of Daily Living, moderately limited in Social Functioning, moderately limited in Concentration and had experienced no Episodes of Decompensation. (R. 139-51). Dr. Tarter also completed a Mental RFC Assessment for Plaintiff, opining that Plaintiff was not significantly limited in Understanding and Memory, and not significantly limited or only moderately limited with respect to Sustained Concentration and Persistence, Social Interaction and Adaptation. In sum, Dr. Tarter concluded that Plaintiff's statements regarding his mental impairment were only partially credible, and that Plaintiff's mental impairment did not preclude him from meeting the basic mental demands of competitive work on a sustained basis. (R. 152-54).

At his next medication check with Dr. Kosturek on September

11

16, 2004, Plaintiff reported feeling much less depressed overall; however, he was sleeping 8 to 10 hours per night and waking up tired due to the side effects of his medications. Plaintiff also reported that he had recently started the OVR program and was "quite happy" about it. Dr. Kosturek discontinued the Trazadone, lowered Plaintiff's dosage of Remeron and continued the Zoloft. (R. 188).

Plaintiff was seen by Dr. Kosturek for a medication check on October 28, 2004. Plaintiff reported that he experienced drowsiness and dizziness from the Zoloft; that he was more anxious than depressed; and that he continued to have difficulty functioning. Dr. Kosturek discontinued the Zoloft, continued the Remeron and prescribed Prozac for Plaintiff.[17] (R. 189). During his medication check on December 17, 2004, Plaintiff reported being less depressed, but still tired, and Dr. Kosturek increased the dosage of Plaintiff's Prozac. (R. 190).

During his next medication check with Dr. Kosturek on March 1, 2005, Plaintiff reported that he had run out of his medications several days before the appointment; that he was under a lot of stress as a result of family and car problems; and that he was still feeling depressed, although he was sleeping better. Dr. Kosturek increased the dosage of Plaintiff's Prozac

---

[17]Prozac is used to treat depression, obsessive-compulsive disorder, some eating disorders and panic attacks. www.nlm.nih. gov/medlineplus/druginfo (last visited 5/19/2008).

12

and continued the Remeron. (R. 191).

During a medication check with Dr. Kosturek on May 10, 2005,
Plaintiff reported that he had been doing relatively well until
recently when he was asked to leave a new job due to performance
issues. In addition to feeling more depressed because he lost
the job, he had run out of his medications. Dr. Kosturek
continued Plaintiff's Prozac and Remeron. (R. 192). Plaintiff's
next medication check with Dr. Kosturek took place on June 7,
2005. Plaintiff reported that he was doing fairly well on his
medications, and that he continued to be involved in the OVR
program. Dr. Kosturek continued Plaintiff's Prozac and Remeron.
(R. 193).

On August 8, 2005, Plaintiff was seen by Danijela Ferri, a
physician's assistant at the Human Services Center, for a
medication check. Plaintiff reported that he had missed
appointments due to difficulties with his car, and that he had
been out of his medications for two weeks. As a result of being
out of his medications, Plaintiff reported difficulty sleeping
and a poor appetite. Miss Ferri noted that Plaintiff was
appropriately groomed with normal psychomotor activity; that
Plaintiff had poor eye contact due to rubbing his eyes constantly
because he had not slept the previous night; that Plaintiff was
oriented x 3; and that Plaintiff's thought process was logical.
Plaintiff was continued on Prozac and Remeron, and he was

13

referred to group therapy at Dr. Kosturek's request. (R. 194).

Plaintiff saw Miss Ferri for another medication check on September 28, 2005. Plaintiff reported that he had run out of his medications several days before the appointment, and Miss Ferri noted that he looked tired. Plaintiff also reported that he had been having more bad days than good days because he was "bored to death doing nothing." When Miss Ferri noted that Plaintiff had failed to show for group therapy which had been scheduled for September 20, 2005, Plaintiff indicated that he did not want to attend group therapy because he suffers from panic attacks. Miss Ferri was going to prescribe Seroquel for Plaintiff but asked him to stay home the first day or two until he saw how the medication affected him.[18] Plaintiff declined the medication, stating that "he has to go out to drink coffee."[19] Miss Ferri described Plaintiff as very tired in appearance with

---

[18]Seroquel is used to treat the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life and strong or inappropriate emotions). It is also used to treat episodes of mania (frenzied, abnormally excited or irritated mood) or depression in patients with bipolar disorder (manic depressive disorder; a disease that causes episodes of depression, episodes of mania and other abnormal moods). www.nlm.nih.gov/medlineplus/druginfo (last visited 5/19/2008).

[19]Plaintiff told Miss Ferri that he drank two quarts of coffee a day. (R. 195). In this connection, during the administrative hearing, Plaintiff testified that he goes to a donut shop or Eat'n Park every day to drink coffee for about an hour at a time; that he goes to these establishments "during their very silent times" to avoid crowds; and that he had cut back on his excessive coffee consumption. (R. 276).

14

poor eye contact, anxious and restless.  Plaintiff was continued on Prozac and Remeron.  (R. 195).

During a medication check with Dr. Kosturek on October 25, 2005, Plaintiff reported that he was still not doing well on his medications.  He continued to feel depressed and to have problems sleeping.  In addition to the effect of his psychiatric problems on sleeping, Plaintiff reported that his legs twitched and moved constantly when he tried to fall asleep.  Dr. Kosturek advised Plaintiff to contact his primary care physician regarding possible treatment for restless leg syndrome.  The doctor continued Plaintiff's Prozac, increased his dosage of Remeron and added Lunesta to his medication regimen.[20]  (R. 196).

Plaintiff saw Miss Ferri for a medication check on November 28, 2005, reporting that he had been compliant with his medications.  With respect to the addition of Lunesta to his medication regimen, Plaintiff reported that although he could stay asleep once he fell asleep, he still did not fall asleep until 3:00 a.m.[21]  Although Plaintiff continued to complain of twitching and constant motion in his legs when he tried to fall

---

[20]Lunesta is used to treat insomnia.  www.nlm.nih.gov/ medlineplus/druginfo (last visited 5/19/2008).

[21]In connection with his sleep habits, Plaintiff informed Miss Ferri that he had worked the night shift all his life; that he was used to being up all night and sleeping during the day; and that, despite the difficulty falling asleep, he got 8 hours of sleep when he did fall asleep.  (R. 197).

15

asleep, he had not seen his primary care physician as recommended
by Dr. Kosturek. Regarding Plaintiff's mental status
examination, Miss Ferri noted that Plaintiff was oriented x 3,
appropriately groomed with some psychomotor retardation, and
slightly depressed with a constricted affect. Ms. Ferri also
noted that Plaintiff's thought process was logical and his
thought content was negative for any suicidal or homicidal
thoughts. Miss Ferri continued Plaintiff's Prozac and Remeron
and discontinued the Lunesta. (R. 197).

Plaintiff's next medication check with Miss Ferri took place
on December 28, 2005. Plaintiff reported that he had been
compliant with his medications, and that, although he continued
to have difficulty falling asleep, he slept 8 hours once he did
fall asleep. Miss Ferri noted that Plaintiff was oriented x 3,
casually dressed and appropriately groomed with some psychomotor
retardation. She also noted that Plaintiff looked tired from
lack of sleep because he had to get up early for the appointment.
Plaintiff's Prozac and Remeron were continued. (R. 198).

During a medication check with Dr. Kosturek on February 22,
2006, Plaintiff reported some improvement on the higher dose of
Prozac, although he was still tired and his energy level remained
low. Dr. Kosturek noted that Plaintiff's affect was constricted
and depressed, but his thought process was logical and his
thought content was negative for suicidal or homicidal thoughts.

16

Dr. Kosturek increased Plaintiff's dosage of Prozac and continued his Remeron. (R. 199).

During a medication check with Dr. Kosturek on April 5, 2006, Plaintiff reported that he had been compliant with his medications, but that he slept all the time since his dosage of Prozac was increased. Dr. Kosturek discontinued the Prozac, prescribed Effexor XR for Plaintiff and continued Plaintiff's Remeron.[22] (R. 200).

On May 9, 2006, Dr. Kosturek completed an assessment of Plaintiff's ability to perform work-related mental activities. With respect to Making Occupational Adjustments, Dr. Kosturek opined that Plaintiff was "seriously limited" in his ability to follow work rules, interact with supervisors and function

---

[22]The notes of this medication check indicate that when asked to go to OVR, Plaintiff responded that he had already gone to OVR; that OVR had paid for him to attend drafting school; and that, despite attending drafting school, he still could not find a job. Nevertheless, he "reluctantly" took OVR's telephone number. (R. 200). In this regard, the Court notes that the ALJ relied on Dr. Kosturek's referral of Plaintiff to OVR as a basis to discredit her opinion that Plaintiff's functional limitations preclude him from working. However, a referral to OVR, without more, is insufficient to discredit Dr. Kosturek's opinion. The ability to do sustained work-related physical or mental activities in a work setting on a "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work scheduled. *See* SSR 96-8p. There is simply no evidence in the record regarding the nature of the work-related rehabilitation provided by OVR or the specific type of program to which Plaintiff was referred. Thus, the ALJ impermissibly relied on Dr. Kosturek's referral of Plaintiff to OVR to discredit her disability opinion.

17

independently,[23] and that Plaintiff's ability to deal with the public, deal with work stresses and maintain attention/ concentration was "poor/none."[24] As to Making Performance Adjustments, Dr. Kosturek opined that Plaintiff was "seriously limited" in his ability to understand, remember and carry out detailed but not complex job instructions, and that Plaintiff's ability to understand, remember and carry out complex job instructions was "poor." Turning to Making Personal-Social Adjustments, Dr. Kosturek opined that Plaintiff was "seriously limited" in his ability to behave in an emotionally stable manner and to demonstrate reliability, and that Plaintiff's ability to relate predictably in social situations was "poor."[25] Finally, regarding Other Work-Related Activities, Dr. Kosturek stated:

[23]Regarding Plaintiff's ability to function independently, Dr. Kosturek noted that Plaintiff "functions independently on a short-term basis then regresses." (R. 222).

[24]In support of this opinion, Dr. Kosturek stated: "Diagnosis is major depression. Client has difficulties with change, poor coping strategies. Client also has problems with concentration & short-term memory. Client also has difficulties in social situations due to severe anxiety. He also experiences insomnia." (R. 223). These limitations were the basis for the only question posed by Plaintiff's counsel to the VE during the administrative hearing. As noted previously, the VE testified that an individual who lacks these abilities could not engage in substantial gainful activity. (R. 289).

[25]In support of this opinion, Dr. Kosturek stated: "The last job client had ended with him experiencing a panic attack & permanently leaving his job in the middle of a work shift. Client also experiences difficulties with basic appointments which entail social situations." (R. 224).

18

"Again, client is experiencing the broad spectrum of depressive
symptomologies associated with his diagnosis. Also, he is a very
anxious person." (R. 221-24).

Dr. Kosturek also completed a Mental Impairment
Questionnaire for Plaintiff on May 9, 2006, indicating that
Plaintiff suffers from the following signs and symptoms related
to his diagnosis of Major Depression without Psychotic Features:
(1) poor memory; (2) sleep disturbance; (3) mood disturbance; (4)
emotional lability; (5) recurrent panic attacks; (6) anhedonia or
pervasive loss of interest; (7) severe psychomotor agitation; (8)
paranoia; (9) feelings of worthlessness; (10) difficulty thinking
or concentrating; (11) social withdrawal or isolation; (12) a
blunt, flat affect; (13) illogical thinking or loosening of
associations; (14) decreased energy; (15) intrusive recollection
of a traumatic experience; (16) generalized persistent anxiety
and (17) irritability. Dr. Kosturek rated Plaintiff's GAF score
at that time a 52, denoting moderate symptoms or difficulties.
*See* Footnote 8. Finally, Dr. Kosturek opined that Plaintiff had
"marked" limitations in his activities of daily living due to
depressive symptoms; that Plaintiff had "marked" limitations with
regard to social functioning; that Plaintiff had "frequent"
deficiencies of concentration, persistence or pace resulting in
the failure to complete tasks in a timely manner; and that due to
his social anxiety, Plaintiff had experienced repeated episodes

19

of deterioration or decompensation in work or work-like settings
which caused him to withdraw from the situation or to experience
exacerbation of signs and symptoms.  (R. 225-26).

## IV.  **Legal Analysis**

### A. **Jurisdiction and Standard of Review**

The Court has jurisdiction of this appeal under 42 U.S.C.
§ 405(g) and § 1383(c)(3) (incorporating § 405(g)), which
provides that an individual may obtain judicial review of any
final decision of the Commissioner by bringing a civil action in
the district court of the United States for the judicial district
in which the plaintiff resides.

The Court's review of the Commissioner's decision is limited
to determining whether the decision is supported by substantial
evidence, which has been described as "such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).
It consists of something more than a mere scintilla, but
something less than a preponderance.  Dobrowolsky v. Califano,
606 F.2d 403, 406 (3d Cir.1979).  Even if the Court would have
decided the case differently, it must accord deference to the
Commissioner and affirm the findings and decision if supported by
substantial evidence.  Monsour Medical Center v. Heckler, 806
F.2d 1185, 1190-91 (3d Cir.1986).

## B. The ALJ's Decision

In order to establish a disability under the Social Security
Act, a claimant must demonstrate an inability to engage in any
substantial gainful activity due to a medically determinable
physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a
continuous period of not less than 12 months. 42 U.S.C.
§ 423(d)(1). A Social Security claimant is considered unable to
engage in any substantial gainful activity only if his physical
or mental impairment or impairments are of such severity that he
is not only unable to do his previous work but cannot,
considering his age, education, and work experience, engage in
any other kind of substantial gainful work which exists in the
national economy. 42 U.S.C. § 423(d)(2)(A).

In Burnett v. Commissioner of Social Security Admin., 220
F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure
an ALJ must follow in evaluating a claim for Social Security
disability benefits, stating in relevant part:

\*    \*    \*

In Plummer, we recounted the five step sequential
evaluation for determining whether a claimant is under a
disability, as set forth in 20 C.F.R. § 404.1520:

In step one, the Commissioner must determine
whether the claimant is currently engaging in
substantial gainful activity. 20 C.F.R. § 404.1520(a).
If a claimant is found to be engaged in substantial
gainful activity, the disability claim will be denied.
Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287,

21

2290-91, 96 L.Ed.2d 119 (1987). In step two, the
Commissioner must determine whether the claimant is
suffering from a severe impairment. 20 C.F.R.
§ 404.1520(c). If the claimant fails to show that her
impairments are "severe," she is ineligible for
disability benefits.

In step three, the Commissioner compares the
medical evidence of the claimant's impairment to a list
of impairments presumed severe enough to preclude any
gainful work. 20 C.F.R. § 404.1520(d). If a claimant
does not suffer from a listed impairment or its
equivalent, the analysis proceeds to steps four and
five. Step four requires the ALJ to consider whether
the claimant retains the residual functional capacity
to perform her past relevant work. 20 C.F.R.
§ 404.1520(d). The claimant bears the burden of
demonstrating an inability to return to her past
relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d
Cir.1994).

If the claimant is unable to resume her former
occupation, the evaluation moves to the final step. At
this stage, the burden of production shifts to the
Commissioner, who must demonstrate the claimant is
capable of performing other available work in order to
deny a claim of disability. 20 C.F.R. § 404.1520(f).
The ALJ must show there are other jobs existing in
significant numbers in the national economy which the
claimant can perform, consistent with her medical
impairments, age, education, past work experience, and
residual functional capacity. The ALJ must analyze the
cumulative effects of all the claimant's impairments in
determining whether she is capable of performing work
and is not disabled.

Plummer, 186 F.3d at 428.

\* \* \*

220 F.3d at 118-19.

With respect to the ALJ's sequential evaluation in the

present case, step one was resolved in Plaintiff's favor: that

is, the ALJ found that Plaintiff had not engaged in substantial

22

gainful activity since his alleged onset date of disability of
December 26, 2003. (R. 14). As to step two, the ALJ found that
Plaintiff suffers from a severe impairment, *i.e.*, a depressive
disorder. (R. 14). Regarding step three, the ALJ found that
Plaintiff's impairment did not meet or equal the requirements of
any listed impairment in 20 C.F.R., Pt. 404, Subpt. P, App. 1,
and, in particular, Listing 12.04 relating to Affective
Disorders. (R. 15). Turning to step four, the ALJ found that
Plaintiff is capable of performing his past relevant work as a
janitor and a stock clerk. (R. 19). Thus, the ALJ concluded
that Plaintiff was not disabled.[26] (R. 19).

## C. Discussion

Listing 12.04 of the Social Security Regulations provides in
relevant part:

12.04 *Affective Disorders:* Characterized by a disturbance
of mood, accompanied by a full or partial manic or
depressive syndrome. Mood refers to a prolonged emotion
that colors the whole psychic life; it generally involves
either depression or elation.

The required level of severity for these disorders is met
when the requirements in both A and B are satisfied, ...

A. Medically documented persistence, either continuous or
intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of
the following:

---

[26]If it is determined that a claimant is or is not disabled
at any step of the sequential evaluation process, the evaluation
does not proceed to the next step. Accordingly, the ALJ in the
present case did not continue his analysis to step five.

23

a. Anhedonia or pervasive loss of interest in almost all
activities; or
        b. Appetite disturbance with change in weight; or
        c. Sleep disturbance; or
        d. Psychomotor agitation or retardation; or
        e. Decreased energy; or
        f. Feelings of guilt or worthlessness; or
        g. Difficulty concentrating or thinking; or
        h. Thoughts of suicide; or
        i. Hallucinations, delusions, or paranoid thinking; ...

AND

        B. Resulting in at least two of the following:

        1. Marked restriction of activities of daily living; or
        2. Marked difficulties in maintaining social functioning;
or
        3. Marked difficulties in maintaining concentration,
persistence, or pace; or
        4. Repeated episodes of decompensation, each of extended
duration; ...

                        *    *    *

20 C.F.R., Pt. 404, Subpt. P, App. 1.

        In support of his summary judgment motion, Plaintiff asserts

that the ALJ erred by failing to find that his mental impairment

met Listing 12.04, which would have established his eligibility

for Social Security benefits at step three of the evaluation

process.  In the alternative, Plaintiff requests a remand of this

case for further administrative proceedings.  After

consideration, Plaintiff's alternative request for a remand will

be granted.

Weight Assigned to the Conflicting Medical Opinions

        The ALJ commenced his analysis of step three of the

evaluation process, *i.e.*, whether Plaintiff's severe mental

                                24

impairment met a listed impairment, as follows:

> "Since there is a medically determined diagnosis of depression, it is assumed for purposes of analysis that Claimant exhibits symptoms sufficient to establish the basic existence of the disorder pursuant to the subparagraph "A" criteria of Listing 12.04. However, review of the evidence does not establish that the subparagraph "B" criteria of severity are met."

(R. 15).

In concluding that the functional limitations resulting from Plaintiff's mental impairment were not severe enough to meet the criteria of Part B of Listing 12.04, the ALJ disregarded the disability opinion of Dr. Kosturek, Plaintiff's long-time treating psychiatrist, stating that her opinion was "basically conclusory, without (sic) little supporting explanation or rationale" (R. 17), and adopted the opinion of Dr. Tarter, the non-examining State agency psychological consultant.[27] Plaintiff maintains that the ALJ erred by doing so, and, after consideration, the Court agrees.

A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." <u>Morales v.</u>

---

[27]In his decision, the ALJ conceded that Dr. Kosturek's assessment of Plaintiff's functional limitations, if accepted as accurate, would compel a finding that Listing 12.04 is met. (R. 17).

25

Apfel, 225 F.3d 310, 317 (3d Cir.2000), *quoting*, Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir.1987). Nevertheless, where the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason. Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993).

In the present case, the ALJ erred in according greater weight to the opinion of Dr. Tarter than the opinion of Dr. Kosturek regarding the severity of Plaintiff's functional limitations because Dr. Tarter's opinion was based on an incomplete record. Specifically, Dr. Tarter's Mental RFC Assessment on which the ALJ relied in rendering his adverse decision was completed on August 18, 2004, less than 3 months after Plaintiff's applications for DIB and SSI were filed. The case file, however, contains substantial evidence relating to Plaintiff's ongoing, regular mental health treatment at the Human Services Center after August 18, 2004, including records of 13 medication checks with either Dr. Kosturek or Ms. Ferri during which Plaintiff's medications were frequently adjusted due to continued depression, anxiety and insomnia and 59 individual psychotherapy sessions with Mr. Petro during which Plaintiff consistently exhibited high levels of anxiety. (R. 205-20, 188-200).

Since Dr. Kosturek's opinion regarding the severity of the

26

functional limitations resulting from Plaintiff's mental
impairment was the only medical opinion based on a complete
record, the ALJ was not free to reject Dr. Kosturek's opinion.
*See, e.g.*, Frankenfield v. Bowen, 861 F.2d 405 (3d Cir.1988)
(Medical judgment of treating physician can be rejected in social
security disability case only on basis of contradictory medical
evidence). In essence, the ALJ substituted his own medical
opinion for that of Dr. Kosturek which is impermissible.
Moreover, the principle that an ALJ should not substitute his lay
opinion for the medical opinions of experts is especially
profound in a case involving a mental disability. *See* Morales v.
Apfel, 225 F.3d 310, 319 (3d Cir. 2000). On remand, the ALJ will
be directed to schedule a consultative psychological evaluation
of Plaintiff for the purpose of obtaining an assessment of the
severity of the functional limitations resulting from Plaintiff's
mental impairment based on the complete record.

Failure to Consider All the Relevant Evidence

In Cotter v. Harris, 642 F.2d 700 (3d Cir.1981), the United
States Court of Appeals for the Third Circuit vacated an adverse
decision by an ALJ in a Social Security case because he failed to
explain his implicit rejection of evidence which supported the
disability claim or even to acknowledge the presence of such

evidence. Contrary to this well-established principle,[28] the ALJ
in the present case failed to acknowledge the evidence relating
to Plaintiff's numerous individual psychotherapy sessions at the
Human Services Center with Mr. Petro which lends support to Dr.
Kosturek's opinion concerning the severity of Plaintiff's
functional limitations. Specifically, Mr. Petro's notes of
Plaintiff's individual psychotherapy sessions are replete with
references to Plaintiff's "high" or "elevated" anxiety level and
"considerable amount of psychomotor activity," as well as
references to Plaintiff's significant problems with interpersonal
relationships. In addition, Mr. Petro's notes show that despite
almost weekly discussions with Plaintiff regarding coping and
stress management strategies, the discussions were largely
unsuccessful. On remand, the ALJ should address this evidence in
the further decision to be issued in this case.

## Credibility Determination

In his decision, the ALJ found that Plaintiff's statements
regarding the limiting effects of his mental impairment were not

---

[28]*See also* Fargnoli v. Massanari, 247 F.3d 34 (3d Cir.
2001)(Although ALJ is not expected in a Social Security
disability case to make reference to every relevant treatment
note in a case where the claimant has voluminous medical records,
the ALJ, as the factfinder, is expected to consider and evaluate
the medical evidence in the record); Wier v. Heckler, 734 F.2d
955 (3d Cir.1984)(In proceeding in which 17-year-old mentally
impaired claimant sought social security benefits, ALJ failed to
mention and explain medical evidence adverse to his decision to
deny benefits necessitating remand).

entirely credible. In so finding, the ALJ relied on the fact that child support proceedings were pending against Plaintiff at the time of the administrative hearing. The ALJ stated:

"Documentary evidence indicates that the claimant is the father of seven children by four different mothers. At hearing, he admitted that there are pending court proceedings against him for delinquency in child-support. Mr. Burns stated that the hearings have been continued, pending the outcome of this hearing upon disability. In view of this issue, there is clear motivation for the claimant to appear to be disabled rather than capable of earning income...."

(R. 18).

As noted by Plaintiff, the record lacks any evidence suggesting that Plaintiff's pursuit of Social Security benefits is motivated by a desire to avoid payment of child support. (Pl's Brief, pp. 17-18). Because the ALJ's credibility determination was based, at least in part, on impermissible speculation, the issue should be addressed further on remand.

_William L. Standish_
William L. Standish
United States District Judge

Date: May 23, 2008

29